**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSHUA BORKMAN and SASHA ST. PIERRE, individually, on an behalf of other members of the general public similarly situated, <u>et al.</u><br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>BMW OF NORTH AMERICA, LLC,<br><br>　　　　　　　Defendant. | Case No. CV 16-2225 FMO (MRWx)<br><br>**ORDER Re: PENDING MOTION** |

Having reviewed all the briefing filed with respect to defendant's Corrected Motion to Dismiss Plaintiff Sasha St. Pierre's Third Amended Class Complaint (Dkt. 42, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, <u>see</u> Fed. R. Civ. P. 78; Local Rule 7-15; <u>Willis v. Pac. Mar. Ass'n</u>, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

**INTRODUCTION**

On November 11, 2016, Sasha St. Pierre ("Pierre") filed the operative Third Amended Class Action Complaint (TAC), against BMW of North America, LLC ("defendant" or "BMW"), asserting claims for: (1) violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, <u>et</u> <u>seq.</u>; (2) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, <u>et</u> <u>seq.</u>; (3) breach of implied warranty pursuant to California's Song-Beverly Consumer Warranty Act ("Song Beverly Act"), Cal. Civ. Code §§ 1792 & 1791.1, <u>et</u> <u>seq.</u>; and (4)

breach of implied warranty pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq. (See Dkt. 38, TAC at ¶¶ 64-115). Plaintiff seeks declaratory and injunctive relief, compensatory, statutory, and exemplary damages, restitution and disgorgement, interest, and attorney's fees and costs. (See id. at ¶ 116, Prayer for Relief).

**PLAINTIFF'S ALLEGATIONS**[1]

Plaintiff[2] brings this action on behalf of herself and "all individuals in the United States who purchased or leased any MINI vehicle equipped with a N14 or N18 turbocharged engine" ("Class Vehicles"), which was designed, manufactured, distributed, and sold by BMW. (See Dkt. 38, TAC at ¶¶ 1, 51). According to plaintiff, "the Class Vehicles suffer from a design or manufacturing defect that causes the oil filter housing gaskets to prematurely break and cause coolant and oil to leak into the engine block" ("Oil Filter Housing Defect" or "Defect"). (Id. at ¶ 5). Plaintiff explains that the Class Vehicles "are equipped with several components tasked with maintaining the flow of oil throughout the engine" ("Engine Lubrication System"), which "include[] the oil filter, oil cooler, oil pan, and oil pump, as well as the housing units for those components, and the oil feed lines that move the oil throughout the engine." (Id. at ¶ 3). With respect to the Oil Filter Housing Defect, plaintiff alleges that the oil filter housing is located in "in an extremely high-temperature area of the engine" but its gaskets are "made of material that is prone to premature wear and deterioration when exposed to heat[.]" (Id. at ¶¶ 2, 4). The gaskets, which connect the oil filter housing to the engine block and the oil cooler, are unable to withstand the high heat environment, and prematurely wear and crack. (See id. at ¶ 4). As a result, the fluids intended to lubricate the engine leak and cause damage to the vehicle. (See id.).

On June 2, 2013, St. Pierre, a California resident, purchased a new 2013 Mini Cooper S

---

[1] Capitalization, quotation marks, and emphases in record citations may be altered without notation.

[2] Joshua Borkman ("Borkman") was a named plaintiff in prior iterations of the complaint, (see, e.g., Dkt. 35, Second Amended Complaint), but is not a plaintiff in the TAC. (See, generally, Dkt. 38, TAC; see also Dkt. 49, Plaintiffs' Opposition to Defendant BMW of North America, LLC's Motion to Dismiss Third Amended Class Action Complaint ("Opp.") at 1 n.1 (noting that Borkman's allegations were removed from the complaint)).

vehicle from an authorized California MINI dealer. (See Dkt. 38, TAC at ¶¶ 22-23). "Passenger safety and reliability were factors in [her] decision to purchase her vehicle[ and p]rior to purchasing her vehicle, [she] spent time researching the Mini Cooper S on MINI's corporate website" and various authorized dealers' websites. (Id. at ¶ 25). On April 15, 2016, with 74,776 on the odometer, St. Pierre noticed a burning odor and fluid leaking from the engine area. (Id. at ¶ 26). She took her vehicle to an authorized MINI dealer, where a service technician verified her concerns and discovered oil and coolant leaking from the oil filter housing. (Id.). The oil filter housing gaskets and oil cooler gaskets were replaced, and St. Pierre was charged $1,143.06 for the repairs. (Id.). St. Pierre "continues to experience check engine alerts, loss of power, and a strong burning smell in the cabin of her vehicle." (Id. at ¶ 27).

Plaintiff avers that the "Oil Filter Housing Defect creates hazardous conditions, including engine oil leaks, sudden loss of power during operation, engine overheating, and, potentially, engine failure." (Dkt. 38, TAC at ¶¶ 9, 33). According to plaintiff, the Defect "cause[s] the vehicle to lose oil pressure suddenly during operation and require[s] immediate shut-off or cause[s] the engine to overheat[,]" which presents an unreasonable risk of accident and injury because such conditions can cause "engines to malfunction during operation without warning, under any driving conditions or speeds, and severely affect a driver's ability to control the vehicle."[3] (Id. at ¶ 33).

Plaintiff alleges that BMW, having superior and exclusive knowledge, knew or should have known about the Oil Filter Housing Defect "through sources not available to consumers," including consumer complaints to defendant's dealers, aggregate data from dealers, consumer complaints to the National Highway Traffic Safety Administration ("NHTSA"), notice from the NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, and other internal sources of aggregate information about the Defect. (See Dkt. 38, TAC at ¶¶ 38-39). Yet, BMW actively concealed the Defect.[4] (See id. at ¶¶ 12, 43-49). According to plaintiff, BMW failed to

---

[3] Plaintiff cites several complaints, some of which are safety related, regarding the Oil Filter Housing Defect from various websites. (See Dkt. 38, TAC at ¶¶ 34-37).

[4] Plaintiff does not allege that BMW made affirmative misrepresentations. (See, generally, Dkt. 38, TAC; Dkt. 49, Opp. at 20 ("[T]his is an omissions case. The case is not predicated on

3

disclose or actively concealed: (1) "any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the Engine Lubrication System;" (2) "that the Class Vehicles, including the Engine Lubrication Systems, were not in good working order, were defective, and were not fit for their intended purposes;" and (3) "that the Class Vehicles and their Engine Lubrication Systems were defective, despite the fact that BMW learned of such defects through high failure rates, customer complaints, and other internal sources, as early as 2011." (Id. at ¶ 43). "As a result of the Oil Filter Housing Defect, BMW received numerous complaints regarding the [] Engine Lubrication System, including customers experiencing engine oil and coolant leaks from the oil filter housing gaskets, sudden loss of power during operation, engine overheating, and engine failure." (Id. at ¶ 44). However, despite "TSBs and recommended repairs," consumers continued to experience such problems. (See id. at ¶ 45). Not only were repairs outlined by various TSBs issued by BMW ineffective at resolving the Oil Filter Housing Defect, the repairs performed "simply masked the defects." (See id. at ¶ 47).

      Plaintiff further alleges that as a result of the Defect, consumers will be required to pay hundreds, if not thousands, of dollars in repair costs. (Dkt. 38, TAC at ¶ 11). According to plaintiff, the Defect is "inherent" in each vehicle and was present in each vehicle at the time of sale. (Id. at ¶ 17). Plaintiff alleges that BMW's omissions were material to her, and like all class members, she "would not have purchased her Class vehicle, or would have paid less" for it had she known of the Engine Oil Filter Housing Defect. (Id. at ¶ 25; see also id. at ¶ 15). BMW has not: (1) issued a warranty extension; (2) recalled the subject vehicles to repair the Defect; (3) offered consumers a suitable repair or replacement free of charge; and (4) offered to reimburse owners and leaseholders for the costs they incurred in diagnosing and repairing the Oil Filter Housing Defect. (Id. at ¶ 14).

      Plaintiff seeks to represent a class and subclasses of individuals who purchased the Class Vehicles. (See Dkt. 38, TAC at ¶ 51). Excluded from the class and subclasses are "persons who have suffered personal injuries as a result of the facts alleged" in the TAC. (Id. at ¶ 52).

---

affirmative representations.")).

4

**LEGAL STANDARDS**

I.  STANDING.

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" Clapper v. Amnesty Int'l USA, 133 S.Ct. 1138, 1146 (2013). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." Id. (internal quotation marks omitted). Article III requires a plaintiff to show that he or she: "(1) has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 704 (2000); Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377, 1386 (2014) ("The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision.") (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130 (1992)). "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004). In the class action context, "standing is satisfied if at least one named plaintiff meets the requirements." Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007) (en banc).

The party seeking to invoke's the court's jurisdiction bears the burden of establishing standing. See Lujan, 504 U.S. at 561, 112 S.Ct. at 2136. However, the burden is low at the pleading stage. See id. "For purposes of ruling on a motion to dismiss for want of standing . . . courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206 (1975); see Maya v. Centex Corp., 658 F.3d 1060, 1068 (9th Cir. 2011) (same).

II. MOTION TO DISMISS.

A motion to dismiss for failure to state a claim should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly

1  ("Twombly"), 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); see Ashcroft v. Iqbal ("Iqbal"), 556
2  U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011).
3  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw
4  the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S.
5  at 678, 129 S.Ct. at 1949; see Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr.,
6  Inc., 590 F.3d 806, 812 (9th Cir. 2010).  The plaintiff must provide "more than labels and
7  conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly,
8  550 U.S. at 555, 127 S.Ct. at 1965; Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see also Cholla
9  Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005)
10 ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if
11 those conclusions cannot reasonably be drawn from the facts alleged.  Nor is the court required
12 to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or
13 unreasonable inferences.") (citations and internal quotation marks omitted).  "Specific facts are
14 not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is
15 and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200
16 (2007) (per curiam) (citations and internal quotation marks omitted); see Twombly, 550 U.S. at
17 555, 127 S.Ct. at 1964.

18      In considering whether to dismiss a complaint, the court must accept the allegations of the
19 complaint as true, Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266,
20 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable to the pleading
21 party, and resolve all doubts in the pleader's favor. See Jenkins v. McKeithen, 395 U.S. 411, 421,
22 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005). Dismissal for
23 failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the
24 absence of factual support for a cognizable legal theory. See Mendiondo v. Centinela Hosp. Med.
25 Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).  A complaint may be dismissed also for failure to state
26 a claim if it discloses some fact or complete defense that will necessarily defeat the claim.  See
27 Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

28      Where a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b)

1 requires that those allegations be pleaded with particularity. Fed. R. Civ. P. 9(b) ("In alleging fraud
2 or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").
3 "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice
4 of the particular misconduct which is alleged to constitute the fraud charged so that they can
5 defend against the charge and not just deny that they have done anything wrong." Bly-Magee v.
6 Cal., 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotation marks omitted). "Averments of fraud
7 must be accompanied by the who, what, when, where, and how of the misconduct charged." Vess
8 v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).
9 "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The
10 plaintiff must set forth what is false or misleading about a statement, and why it is false." Id.
11 (internal quotation marks omitted) (alteration and emphasis in original).

**DISCUSSION**

I. STANDING.

BMW contends that plaintiff lacks Article III standing because she has not alleged concrete economic injuries. (See Dkt. 42-1, Memorandum of Points and Authorities in Support of [BMW's] Corrected Motion to Dismiss [] Third Amended Class Action Complaint ("Memo") at 4-8). Among other things, BMW argues that plaintiff's overpayment and diminished value claims are insufficient to confer standing because they are conclusory. (See id. at 6-8). The court disagrees.

Plaintiff alleges that the oil filter housing is defective because it is located "in an extremely high-temperature area of the engine" but its gaskets are "made of material that is prone to premature wear and deterioration when exposed to heat[.]" (Dkt. 38, TAC at ¶¶ 2, 4). Plaintiff adds that in 2007, BMW began using a newly-designed N14 engine in its MINI Gen2 vehicles and changed the location of the oil filter housing from the back to the front of the engine block. (See id. at ¶ 7). In the Class Vehicles' engines, which are turbocharged, this change meant that the oil filter housing "sat buried between the coolant tank, exhaust manifold, and the turbocharger – an extremely high temperature area of the engine." (Id.). With respect to the N18 engine, released in 2011 MINI vehicles, the same overall design was maintained, but the engine's temperature was increased. (Id. at ¶ 8). When the gaskets, which connect the oil filter housing to the engine block

7

and the oil cooler, prematurely wear and crack, the fluid intended to lubricate the engine leaks and causes damage to the vehicle. (See id. at ¶ 4). Plaintiff alleges that she experienced the Defect (see id. at ¶ 26), and was charged $1,143.06 for repairs. (Id.). Moreover, she "continues to experience check engine alerts, loss of power, and a strong burning smell[.]" (Id. at ¶ 27). According to plaintiff, had she known of the Oil Filter Housing Defect she would not have purchased her vehicle, or would have paid less for it. (See id. at ¶ 2). These allegations are sufficient to confer standing.[5] See In re Toyota Motor Corp., 790 F.Supp.2d 1152, 1163 (C.D. Cal. 2011) ("[O]nce the safety defect is sufficiently and plausibly pled by all Plaintiffs, the economic losses resulting from the defect are readily established: defective cars are simply not worth as much"); Maya, 658 F.3d at 1069 ("Allegedly, plaintiffs spent money that, absent defendants' actions, they would not have spent. . . . This is a quintessential injury-in-fact.") (citation omitted); In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig., 754 F.Supp.2d 1145, 1161 (C.D. Cal. 2010) ("Standing merely requires a redressable injury that is fairly traceable to Defendants' conduct. Whether a plaintiff can recover for that injury under a particular theory of liability is a separate question.").

Defendant also contends that plaintiff lacks standing to seek injunctive relief because she does not allege that she will or intends to buy another MINI vehicle, and thus, is not threatened by the same future violation. (See Dkt. 42-1, Memo at 8). However, with respect to plaintiff's request for injunctive relief, plaintiff seeks an order compelling BMW to, among other things: (1)

---

[5] BMW also argues that plaintiff's vehicle repair is not fairly traceable to the Oil Filter Housing Defect since there are no facts linking her high-mileage repair, totaling $1,143.06, to the Defect. (See Dkt.42-1, Memo at 4-5; see also Dkt. 42-2, Declaration of Eric Kizirian in Support of BMW of North America, LLC's Corrected Motion to Dismiss Plaintiff's Third Amended Class Action Complaint ("Kizirian Decl.") at ¶ 10; Dkt. 42-7 (Repair Order)). Specifically, BMW maintains that the April 15, 2016 Repair Order "does not link the repair to the alleged cracking, deformed, or deteriorated seal defect." (Dkt. 42-1, Memo at 5). However, while a defendant may make a factual attack on subject matter jurisdiction and properly rely on extrinsic evidence, see Savage v. Glendale Union High School, 343 F.3d 1036, 1039-40 (9th Cir. 2003), cert. denied, 541 U.S. 1009 (2004), BMW has not provided any evidence that it is the responsibility of a service department in a automobile dealership to describe the root cause of a defect in a repair order, let alone evidence that plaintiff's April 2016 repair is not fairly traceable to the Oil Filter Housing Defect. In any event, based on the determination that plaintiff has standing, the court need not address this contention.

8

"remove and replace Plaintiff's and Class Members' Engine Lubrication Systems with a suitable alternative product;" (2) "provide Class Members with replacement Engine Lubrication System components that do not contain the defects alleged" in the TAC; and (3) "reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed[.]" (Dkt. 38, TAC at ¶ 116, Prayer for Relief). Thus, plaintiff's request for injunctive relief is not exclusively premised on future violations.

II. CONSUMER PROTECTION CLAIMS.

A. Rule 9(b).

BMW contends plaintiff's UCL and CLRA claims do not comply with Rule 9(b).[6] (See Dkt. 42-1, Memo at 9-11). Plaintiff does not dispute that Rule 9 applies to her claims, but argues that to the extent she must comply with Rule 9, she has done so. (See Dkt. 49, Opp. at 14). The court agrees. Plaintiff has "adequately allege[d] the 'who what when and how,' given the inherent limitations of an omission claim." MacDonald v. Ford Motor Co., 37 F.Supp.3d 1087, 1096 (N.D. Cal. 2014). "In short, the 'who' is [BMW], the 'what' is its knowledge of a defect, the 'when' is prior to the sale of Class Vehicles, and the 'where' is the various channels of information through which [BMW] sold Class Vehicles." Id.; see also Velasco v. Chrysler Group LLC, 2014 WL 4187796, *5 (C.D. Cal. 2014) (applying same analysis).

B. Duty to Disclose.

BMW contends that it had no duty to disclose the alleged Oil Filter Housing Defect. (See Dkt. 42-1, Memo at 11-19).

1. **Pre-Sale Knowledge**.

According to BMW, it has no duty to disclose the Defect at the time of sale since plaintiff fails to provide any allegations that plausibly demonstrate that BMW knew of a defect at the time she purchased her vehicle. (See Dkt. 42-1, Memo at 11-12). BMW's contention is unpersuasive.

Plaintiff alleges that since at least 2012 BMW knew about the Oil Filter Housing Defect

---

[6] BMW also contends that the TAC does not comply with Rule 8 since it does not put BMW on notice of a defect theory. (See Dkt. 42-1, Memo at 8-9). The court disagrees. The TAC clearly sets forth plaintiff's theory of the Oil Engine Housing Defect. (See Dkt. 38, TAC at ¶¶ 2, 3-9).

through consumer complaints to defendant's dealers, aggregate data from dealers, consumer complaints to the NHTSA, and resulting notice from the NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, and other internal sources of aggregate information about the Defect. (See Dkt. 38, TAC at ¶ 39). With respect to consumer complaints, eight were posted on the NHTSA website, 12 on third-party websites, and three complaints pre-date plaintiff's purchase of her vehicle. (See id. at ¶¶ 34(a) (November 23, 2012 NHTSA Complaint); 34(b); April 5, 2013 NHTSA Complaint; 37(a)(3)); see also Dkt. 49, Opp. at 17 ("[T]hree of [the] cited consumer complaints, which class members made to the NHTSA, pre-date Plaintiff's purchase.")). Such allegations are sufficient at this stage of the litigation.[7] See, e.g., Cirulli v. Hyundai Motor Co., 2009 WL 5788762, *4 (C.D. Cal. 2009) (finding adequate allegation of knowledge based in part on allegation that "[s]ince 1999, [Defendant] has . . . constantly tracked the National Highway Traffic Safety Administration . . . database to track reports of defective Sonata sub-frames. From this source, [Defendant] knew that its 1999-2004 Sonatas were experiencing unusually high levels of sub-frame deterioration, steering control arm separation, steering loss, and highway accidents"); Falk v. General Motors Corp., 496 F.Supp.2d 1088, 1096 (N.D. Cal. 2007) (finding sufficient allegations that defendant had exclusive knowledge of defect based on allegations that "only GM had access to the aggregate data from its dealers, only GM had access to pre-release testing data, and only GM had access to the numerous complaints from its customers") (internal brackets and quotation marks omitted); Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1146 (9th Cir. 2012) (pointing to Cirulli as an example of successful allegations of pre-sale knowledge); Williams v. Yamaha Motor Co. Ltd., 851 F.3d 1015, 1027 (9th Cir. 2017) (explaining that "Wilson did not hold that consumer complaints may never support an allegation of presale knowledge" and noting Wilson's citation to Cirulli); Avedisian v. Mercedes-Benz USA, LLC, 2013 WL 2285237, *7 (C.D. Cal. 2013) ("Plaintiff alleges that Defendant learned about the defect from pre-release testing data, consumer complaints, dealer complaints, further testing, warranty data, goodwill date, repair date, and parts purchase information.[] The earliest of the

---

[7] The TAC refers to TSBs issued by BMW (see Dkt. 38, TAC at ¶¶ 45-46); however, it does contain any details regarding such TSBs. (See, generally, id.).

10

consumer complaints predates the May 2009 sale of Plaintiff's Class Vehicle.[] Based on these allegations, the Court finds that there is a plausible inference that Defendant knew of the Chrome Defect at the time of the sale."); Myers v. BMW of North America, LLC, 2016 WL 5897740, *4 (N.D. Cal. 2016) ("[P]laintiff submitted several dated complaints posted to the NHTSA website. As two of these complaints are dated prior to the time [plaintiff] must have purchased her car, BMW could have accessed this information and been aware of the complaints at the time [plaintiff] purchased her vehicle. Further, because manufacturers such as BMW use the NHTSA website to communicate information to consumers, it is reasonable to infer that BMW has knowledge of and is aware of the complaints submitted by consumers to the NHTSA. These consumer complaints, in conjunction with [plaintifff's] other allegations that BMW knew of the . . . defect through its 'dealerships, pre-release data, and training manuals, among other internal sources of aggregate information about the problem,' can give rise to the inference that BMW knew of the . . . defect and had a duty to disclose it. [Plaintiff] has adequately pleaded that BMW had exclusive knowledge of the . . . defect.").

### 2. **Safety-Based Defect**.

BMW next argues that plaintiff has not sufficiently alleged a safety-based duty to disclose the alleged Defect. (See Dkt. 42-1, Memo at 15-18). "In order to state a claim for failing to disclose a safety defect, Plaintiff[] must allege (1) the existence of a design defect; (2) the existence of an unreasonable safety hazard; (3) a causal connection between the alleged defect and the alleged safety hazard; and [(4)] that the manufacturer knew of the defect at the time a sale was made." Apodacav. Whirlpool Corp., 2013 WL 6477821, *9 (C.D. Cal. 2013); Williams, 851 F.3d at 1025-26 (same).

Here, plaintiff alleges that the Oil Filter Housing Defect "creates hazardous conditions, whereby leaking oil and coolant result in sudden loss of power during operation, engine overheating, and, potentially, engine failure" and "can cause engine malfunctions at any time and under any driving conditions or speeds, thereby increasing the risk of accidents and injury by severely compromising a driver's ability to control the vehicle during operation." (Dkt. 38, TAC at ¶¶ 9, 33; see also Dkt. 42-1, Memo at 16 (citing same allegation)). The court finds that plaintiff's

allegations are sufficient. See, e.g., Asghari v. Volkswagen Group of America, Inc., 42 F.Supp.3d 1306, 1330-31 (C.D. Cal. 2013) (finding allegations of engine's inability to utilize oil properly, which could cause engine failure to occur at any time, adequately alleged a safety defect). Moreover, to the extent BMW takes issue with plaintiff's reliance on consumer complaints, (see Dkt. 42-1, Memo at 16-18),"[s]uch contentions are better raised on summary judgment." Marsikian v. Mercedes Benz USA, LLC, 2009 WL 8379784, *6 (C.D. Cal. 2009); see also Philips v. Ford Motor Co., 2015 WL 4111448, *10 (N.D. Cal. 2015) ("Whether the alleged defects are an unreasonable safety hazard is a question of fact, and based on the allegations in the [complaint], the Court cannot say that Plaintiffs' allegations in that regard are deficient as a matter of law."); Avedisian, 2013 WL 2285237, at *6 ("California law does not speak to the severity of injury necessary to characterize something as a safety defect, only that there be a 'safety concern.'") (quoting Daugherty v. American Honda Motor Co., Inc., 144 Cal.App.4th 824, 836 (2006)). In short, the safety hazard posed by the Defect "is a factual dispute which is not appropriately resolved on a motion to dismiss." Avedisian, 2013 WL 2285237, at *6.

BMW adds that neither plaintiff nor the three consumers who submitted online complaints prior to plaintiff's purchase of her vehicle experienced a hazardous condition or cracked seals. (See Dkt. 42-1, Memo at 17). However, plaintiff need not plead that she or anyone else has actually been injured in order to state a claim under the CLRA or UCL. See Daugherty, 144 Cal.App.4th at 836 (duty to disclose based on omissions may arise if plaintiff alleges "physical injury or . . . safety concerns posed by the defect") (emphasis added); Parenteau v. Gen. Motors, LLC, 2015 WL 1020499, *5 (C.D. Cal. 2015) ("[T]he case law does not require anyone to have actually been injured before an omission regarding an alleged safety defect can be held material and actionable.[] Rather, as stated in Wilson, the defect must 'pose safety concerns.'") (quoting Wilson, 668 F.3d at 1142) (citation omitted); Herremans v. BMW of North America, LLC, 2014 WL 5017843, *14 (C.D. Cal. 2014) ("Where plaintiffs are able adequately to allege an unreasonable risk to safety – i.e., a risk to physical injury – as the result of an automotive defect, . . . the court agrees . . . that they need not plead that they or another class member have suffered such injury to state a viable CLRA or UCL claim.").

Finally, BMW's reliance on Williams is unavailing. (See Dkt. 52, Notice of Recent Supplemental Ninth Circuit Authority). In Williams, the plaintiffs alleged that marine motors "contained an inherent design defect that caused severe, premature corrosion in the motors' dry exhaust system[,]" 851 F.3d at 1019, and that such a defect posed the risk of onboard fires and accidents and associated injuries due to loss of steering power. Id. at 1028. The Ninth Circuit held that plaintiffs failed to plead the existence of an unreasonable safety hazard because plaintiffs' "own characterization of the defect" was that it "merely accelerated the normal and expected process of corrosion" and absent the defect, there was no allegation that corrosion would not occur. Id. The court reasoned that were it to conclude that plaintiffs' "allegations of premature but otherwise normal wear and tear plausibly establish an unreasonable safety hazard, [the court] would effectively open the door to claims that all of [defendant's] outboard motors eventually pose an unreasonable safety hazard." Id.

Here, plaintiff does not allege that the Oil Filter Housing Defect merely accelerated the normal and expected process of cracking and breaking gaskets. (See, generally, TAC). Rather, plaintiff alleges that the oil filter housing unit and its gaskets are defective due to their proximity to engine heat sources, the lack of shielding, and the gasket's insufficiently heat-resistant materials. (See Dkt. 38, TAC at ¶¶ 2-8); see, e.g., Keegan v. American Honda Motor Co., Inc., 838 F.Supp.2d 929, 942 (C.D. Cal. 2012) ("While tires must be replaced periodically, even in non-defective vehicles, the defect alleged in the class vehicles is a problem with their rear suspension. This is neither a maintenance item nor a part whose defect would be open and obvious to the regular driver. Moreover, the mere fact that a tire is a maintenance item does not foreclose the possibility that there are safety concerns with the class vehicles. Brakes require regular maintenance and replacement, but it would be difficult to argue that a brake defect would not be a safety issue."). Moreover, as plaintiff points out, BMW relies on extraneous information from wikiHow.com to support its proposition that gaskets and seals are wear and tear items that commonly deteriorate in all vehicles over time. (See Dkt. 49, Opp. at 13; Dkt. 42-1, Memo at 11 n. 7).

3. **Active Concealment**.

BMW contends that plaintiff has not alleged facts showing active concealment. (See Dkt. 42-1, Memo at 18-19). "An allegation of active concealment must plead more than an omission; rather, a plaintiff must assert affirmative acts of concealment; e.g., that the defendant sought to suppress information in the public domain or obscure the consumers' ability to discover it." Taragan v. Nissan N. Am., Inc., 2013 WL 3157918, *7 (N.D. Cal. 2013) (internal quotation marks omitted); Gray v. Toyota Motor Sales, U.S.A., 2012 WL 313703, *10 (C.D. Cal. 2012) ("[I]f mere nondisclosure constituted 'active concealment,' the duty requirement would be subsumed and any material omission would be actionable."). Here, the TAC alleges more than BMW's failure to disclose the Defect. (See Dkt. 38, TAC at ¶¶ 14, 16, 42, 43-49 ). For instance, plaintiff alleges that when consumers presented the Class Vehicles to authorized dealers for repairs, "rather than repair the problems under warranty, BMW dealers performed repairs that simply masked the defects." (Id. at ¶ 47; see also id. at ¶ 19). Plaintiff further alleges that despite notice of the Defect from numerous consumer complaints and dealership repair orders, BMW has not: (1) recalled the subject vehicles, (see id. at ¶ 14); (2) offered suitable and free repairs, (id.); or (3) notified plaintiff and class members of the Defect. (See id. at ¶ 16). Under the circumstances, the court finds that such conduct could raise an inference of active concealment. See, e.g., Falk, 496 F.Supp.2d at 1097 (finding plaintiffs sufficiently alleged active concealment where they alleged that defendant "never made any attempt to notify other customers or effect a recall" in the face of various customer complaints and that defendant replaced the defective part with an "equally defective" one, suggesting that it "tried to gloss over the problems" and "giving the impression that any defects were unique cases").

4. **Summary**.

The court finds that plaintiff has plausibly alleged that: (1) BMW had knowledge of the alleged Oil Filter Housing Defect at the time plaintiff purchased her vehicle; (2) the Defect poses an unreasonable safety hazard; and (3) BMW actively concealed the alleged Defect. Thus, the

court denies defendant's motion to dismiss the UCL and CLRA claims.[8]

C. Reliance.

BMW contends that plaintiff has failed to allege reliance. (See Dkt. 42-1, Memo at 19-21). "An essential element for a fraudulent omission claim is actual reliance." Daniel v. Ford Motor Co., 806 F.3d 1217, 1225 (9th Cir. 2015). "To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." Id. "A plaintiff may do so by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently." Id. (internal quotation marks omitted). As discussed above, plaintiff has sufficiently alleged a safety-related defect. Accordingly, reliance is presumed. See id. ("That one would have behaved differently can be presumed, or at least inferred, when the omission is material. . . . Alleged defects that create unreasonable safety risks are considered material.") (internal quotation marks omitted); id. at 1226 ("A reasonable fact finder could infer that a vehicle that experiences premature and more frequent tire wear would pose an unreasonable safety risk, such that it can be presumed that the nondisclosure of the safety risk impacted Plaintiffs' purchasing decision.").

III. IMPLIED WARRANTY CLAIMS.

A. Song-Beverly Act.

BMW contends that plaintiff has not adequately pleaded a claim for breach of implied warranty under the Song-Beverly Act. (See Dkt. 42-1, Memo at 21-22).

The Song-Beverly Act "is a remedial measure intended for the protection of consumers and should be given a construction consistent with that purpose." Brand v. Hyundai Motor Am., 226 Cal.App.4th 1538, 1545 (2014). It provides that "every sale of consumer goods that are sold at retail in [California] shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable[,]" Cal. Civ. Code § 1792, which means, as relevant

---

[8] BMW also argued that plaintiff failed to identify a partial representation that triggered a duty to disclose. (See Dkt. 42-1, Memo at 14-15). However, plaintiff clarified that her complaint is an omissions case and is not predicated on affirmative misrepresentations. (See Dkt. 49, Opp. at 20).

15

here, that the goods "[a]re fit for the ordinary purposes for which such goods are used."[9] Cal. Civ. Code § 1791.1(a)(2). "The core test of merchantability is fitness for the ordinary purpose for which such goods are used." Isip v. Mercedes-Benz USA, LLC, 155 Cal.App.4th 19, 26 (2007). With respect to vehicles, the warranty of merchantability is met if the vehicle is "in safe condition and substantially free of defects[.]" Id. at 27.

"To the extent that the Song-Beverly Act gives rights to the buyers of consumer goods, it prevails over conflicting provisions of the Uniform Commercial Code." Mexia v. Rinker Boat Co, Inc., 174 Cal.App.4th 1297, 1304 (2009) (internal quotation and alteration marks omitted). California courts have "reject[ed] the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability." Isip,155 Cal.App.4th at 27 ("A vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose."); see Brand, 226 Cal.App.4th at 1546 ("[A] merchantable vehicle under the statute requires more than the mere capability of just getting from point A to point B.") (internal quotation marks omitted).

Here, construing the TAC in the light most favorable to plaintiff, see Berg, 412 F.3d at 1125, the court is persuaded that plaintiff has adequately pleaded a breach of the implied warranty pursuant to the Song-Beverly Act. Plaintiff alleges that the Oil Filter Housing Defect creates hazardous conditions, including loss of power during operation, engine overheating, and potentially, engine failure.[10] (See Dkt. 38, TAC at ¶ 9); Asghari, 42 F.Supp.3d at 1339 ("Vehicles subject to engine failure cannot be said to be merchantable."); Troup v. Toyota Motor Corp., 545 F.App'x 668, 669 (9th Cir. 2013) (noting that under California law, a "defect need not render a

---

[9] An implied warranty of merchantability under the Song-Beverly Act generally requires that consumer goods: "(1) Pass without objection in the trade under the contract description[;] (2) Are fit for the ordinary purposes for which such goods are used[;] (3) Are adequately contained, packaged, and labeled[; and] (4) Conform to the promises or affirmations of fact made on the container or label." Cal. Civ. Code § 1791.1(a).

[10] BMW contends that plaintiff continues to drive her vehicle "problem-free" without "loss of power." (See Dkt. 42-1, Memo at 21). However, plaintiff alleges that since the repair, she continues to "experience check engine alerts, loss of power, and a strong burning smell in the cabin of her vehicle." (See Dkt. 38, TAC at ¶¶ 26-27).

vehicle inoperable to give rise to a claim for breach of implied warranty" and affirming dismissal of implied warranty claim because "the alleged defect did not compromise the vehicle's safety, render it inoperable, or drastically reduce its mileage range").

  B.  MAGNUSON-MOSS ACT.

"Claims under the Magnuson-Moss [] Act stand or fall with . . . express and implied warranty claims under state law." Daniel, 806 F.3d at 1227 (internal quotation marks omitted). Accordingly, given the above discussion, defendant's Motion is denied as to this claim.

**This Order is not intended for publication. Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendant's Corrected Motion to Dismiss Plaintiff Sasha St. Pierre's Third Amended Class Complaint **(Document No. 42)** is **denied**.

2. Defendant shall file its Answer to the Third Amended Complaint no later than **September 8, 2017**.

Dated this 28th day of August, 2017.

                 /s/
              Fernando M. Olguin
             United States District Judge